J-S40003-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.R.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1463 EDA 2024 |

Appeal from the Decree Entered May 2, 2024
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000504-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.K., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1464 EDA 2024 |

Appeal from the Decree Entered May 2, 2024
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-AP-0000508-2023

BEFORE: STABILE, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY STABILE, J.:                    **FILED DECEMBER 2, 2024**

S.K. ("Father") appeals from the May 2, 2024 decrees granting the petitions filed by the Philadelphia Department of Human Services ("DHS" or "the Agency") and involuntarily terminating his parental rights to his biological daughter, G.R.K., born in August 2014, and biological son, K.D.K., born in

December 2020 (collectively, "the Children").[1] After careful consideration, we affirm the termination decrees.

The certified record reveals the following relevant facts and procedural history. In August 2019, when G.R.K. was five years old and residing in Father's physical custody, DHS received a General Protective Services ("GPS") report alleging that Father entered a drug treatment facility and left G.R.K. in the care of her paternal family. The report further alleged that the paternal family were unable to meet her basic needs, and Mother was uninvolved at the time. *See* N.T., 4/3/24, at 5-6. As a result, the court adjudicated G.R.K. dependent on September 16, 2019.[2] *See* Exhibit DHS 1. G.R.K. was placed in kinship care with an aunt until March 2020. She was then placed in foster care, where she remained at the time of the subject proceedings. *See* Exhibit DHS 1; N.T., 4/3/24, at 23.

The court established a permanency goal of reunification and, as part of his single case plan provided through the Community Umbrella Agency ("CUA"), Father was required to, *inter alia*: participate in a dual diagnosis

_____

[1] By separate decrees of the same date, the trial court additionally terminated the parental rights of the Children's mother, E.M. ("Mother"), and any unknown putative father. Neither Mother nor any unknown putative father filed an appeal or participated in the instant appeals.

[2] G.R.K. had been adjudicated dependent due to drug and alcohol concerns involving Father several years prior and was subsequently reunified with Father. *See* N.T., 4/3/24, at 6.

mental health and drug and alcohol assessment and follow all treatment recommendations; attend random drug and alcohol screening; participate in services through the Achieving Reunification Center ("ARC"), including parenting, housing, and employment; and engage in supervised visitation. *See* Exhibit DHS 1; N.T., 4/3/24, at 9. These requirements remained substantially similar throughout the dependency proceeding. Father understood compliance therewith was necessary for reunification. *See* N.T., 4/3/24, at 8.

Almost three years later, on September 12, 2022, the trial court adjudicated K.D.K. dependent as a result of Mother's substance abuse issues. *See* Exhibit DHS 1; N.T., 4/3/24, at 7. Significantly, despite Father's initial denial, his paternity of K.D.K. was ultimately confirmed. *See* N.T., 4/3/24, at 18, 33. K.D.K. was placed in foster care with G.R.K. *See* Exhibit DHS 1; N.T., 4/3/24, at 7-8.

Permanency review hearings were held by the court at regular intervals. Then, on December 18, 2023, DHS filed petitions for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The trial court ultimately held evidentiary hearings on the petitions on April 3, 2024, and May 2, 2024.[3] The Children, then ages

_____

[3] The certified record solely contains the notes of testimony for May 2, 2024. Notably, the testimony for both April 3, 2024 and May 2, 2024 are appended to Father's brief. As the veracity of these transcripts is not in dispute, we rely
*(Footnote Continued Next Page)*

nine and three years old, were represented by a guardian *ad litem*, Michael

Graves, Esquire, and separate legal interest counsel, Jay Stillman, Esquire, in

compliance with 23 Pa.C.S.A. § 2313(a).[4]   DHS presented the testimony of

---

on the copy of the notes of testimony for April 3, 2024 attached to Father's brief.  **See Commonwealth v. Barnett**, 121 A.3d 534, 544 n.3 (Pa. Super. 2015) (stating, "While this Court generally may only consider facts that have been duly certified in the record, where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it." **Commonwealth v. Brown**, 52 A.3d 1139, 1145 n.4 (Pa. 2012)) (internal citation omitted).  We, however, stress and remind counsel, "Appellant has the responsibility to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal."  **Commonwealth v. Wint**, 730 A.2d 965, 967 (Pa. Super. 1999) (citations and internal quotation marks omitted); **see also** Pa.R.A.P. 1921 Note (stating, "Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.") (citation omitted).

[4] **See In re K.M.G.**, 240 A.3d 1218, 1238 (Pa. 2020) (holding appellate courts should engage in "limited *sua sponte* review" concerning a child's statutory right to counsel in the termination context).  While neither Attorney Graves nor Attorney Stillman submitted a brief to this Court, they both joined DHS's argument in support of termination of Father's parental rights at the conclusion of the subject proceedings.  **See** N.T., 5/2/24, at 25-26.

We observe that the trial court chided Attorney Stillman on April 3, 2024, for his failure to report the Children's preferences.  **See** N.T., 4/2/24, at 49-53. We caution the trial court that its reprimand was improper inasmuch as our Supreme Court has explicitly declined to adopt a requirement that a child's legal representative must divulge his client's preferences in a specific fashion. **See K.M.G.**, 240 A.3d at 1237-1238 ("[W]e find nothing in the language of the Adoption Act requiring that their preference be placed on the record. . . . Moreover, we observe that the child's legal counsel has a duty of confidentiality . . . such that they should not be compelled to disclose the child's preferences."); **see also In re P.G.F.**, 247 A.3d 955, 966 (Pa. 2021) ("[S]ignificant deference must be accorded to counsel's approach in discerning a child's preferences and the child's articulation thereof.").

the CUA case manager, Rochelle Richards. DHS also proffered the orders from the underlying dependency proceeding as Exhibit DHS 1. Additionally, Father testified on this own behalf.

CUA had no verification that Father successfully completed a drug and alcohol treatment program or made any progress with respect to concerns related to drugs and alcohol. *See* N.T., 4/3/24, at 9-10. Notably, Father tested positive for opiates in March 2023 when CUA was last able to obtain a drug and alcohol screen. *See id.* at 10-11. Despite completing a parenting class in 2021, Father did not complete a second parenting class when reordered by the court. *See id.* at 15. CUA had not assessed Father's home since the beginning of 2023. *See id.* at 10-11, 15. Father failed to maintain consistent contact with CUA. Indeed, CUA's last successful contact with Father was in May 2023. *See id.* at 14-16.

Finally, Father's supervised visitation with G.R.K. became inconsistent in late 2022. *See id.* at 13. Shortly thereafter, in January 2023, based upon allegations that Father brought drugs and a gun to a visit in conjunction with a plan to abduct G.R.K., who was then eight years old, the court suspended his visitation pending a CUA investigation. *See id.* at 11, 29-30; *see also* Exhibit DHS 1. In May 2023, after completion of said investigation, the court maintained the suspension of Father's visitation with G.R.K. *See* N.T., 4/3/23, at 11-13, 29; *see also* Exhibit DHS 1. G.R.K. has had no contact with Father since the suspension of his visitation. *See* N.T., 4/3/24, at 39-41.

By decrees dated and entered May 2, 2024, the trial court involuntarily terminated Father's parental rights to the Children. Specifically, the court terminated Father's parental rights with respect to G.R.K. pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The court terminated Father's parental rights with respect to K.D.K. pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).

Father filed timely notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this court consolidated *sua sponte*. The trial court filed a responsive Rule 1925(a) opinion on August 2, 2024.

On appeal, Father raises the following issue for our review:

Did [DHS] present clear and convincing evidence to support the trial court's finding that pursuant to 23 Pa.C.S.A. § 2511(b) and pursuant to recent case law that there was no "necessary and beneficial" bond between Father and [G.R.K.]; that no harm would be caused to [G.R.K.] if that bond was severed and that it would be in [G.R.K.]'s best interest to be adopted pursuant to 23 Pa.C.S.A. § 2511(b)?

Father's Brief at 3 (cleaned up).

Initially, we observe that Father does not present a question on appeal with respect to K.D.K. *See id.* Therefore, the termination of Father's parental rights to K.D.K. is not before us. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-466 (Pa. Super. 2017) (citations omitted) (explaining this Court will not review an appellant's claim unless it is included in both the concise statement and statement of questions involved, developed in his or her argument, and

supported by citation to relevant legal authority). In addition, we observe

Father has not raised any claim regarding Section 2511(a) related to G.R.K.[5]

*See* Father's Brief at 3; *see also M.Z.T.M.W.*, 163 A.3d at 465-466.  As such,

we confine our review to that aspect of the decree involuntarily terminating

Father's parental rights to nine-year-old-G.R.K. under Section 2511(b).

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result.  Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.  Termination of parental rights has significant and permanent consequences for both the parent and child.  As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing

_____

[5] In his brief, Father concedes that he has waived these arguments.  *See* Father's Brief at 3 n.1.

as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-830 (Pa. Super. 2022) (internal citations and quotation marks omitted).

If the orphans' court determines the petitioner has established grounds for termination under any of the subsections of Section 2511(a) by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b).

Section 2511(b) provides as follows:

> **Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Our Supreme Court in *In re E.M.*, 620 A.2d 481, 485 (Pa. 1993), first recognized that the "emotional needs and welfare" analysis under Section 2511(b) should include, in part, the child's bond with his or her parent. In doing so, trial courts must examine the effect on the child of severing such a bond, which requires "a determination of whether the bond is necessary and

beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." ***In the Interest of K.T.***, 296 A.3d 1085, 1113 (Pa. 2023). As the Court has explained:

> Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. ***See E.M.***, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

***K.T.***, 296 A.3d at 1109-1110 (some citations omitted). As such, the Court has distinguished "extreme emotional consequences" from an "adverse impact" to the child when parental rights are terminated. ***K.T.*** at 1111. Moreover, the Court cautioned that a trial court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." ***Id.*** at 1114. "[T]o grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." ***Id.***

The ***K.T.*** Court further recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." ***K.T.***, 296 A.3d at 1109. For instance, if relevant in a case, a trial court "can equally emphasize the safety needs of the

child" in its analysis under Section 2511(b). ***See In re M.M.***, 106 A.3d 114, 118 (Pa. Super. 2014).

Instantly, Father argues that DHS presented insufficient evidence to terminate his parental rights to G.R.K. pursuant to Section 2511(b). ***See*** Father's Brief at 6-12. He contends that the trial court failed to consider whether there was a bond between Father and G.R.K. and the nature of that bond. ***See id.*** at 8. Father states, in part:

> It is not clear and convincing that Child's best interest is served by terminating Father's rights. It is clear and convincing that [G.R.K.] and Father had a loving parent child relationship that needs to be continued in order for [G.R.K.] to thrive. It would be more appropriate for the goal to be Permanent Legal Custody rather than adoption. Father and [G.R.K.] had a bond at removal and Father maintained this necessary and beneficial bond with [G.R.K.] by consistently visiting throughout the case until the visits were suspended in 5/2023.
>
> [G.R.K.] must be allowed to continue getting the love and nurturing that Father has given her in the past but an adoption will sever the Father and the extended family from her life forever. The necessity of continuing Father and [G.R.K.]'s bond in the future is so that [G.R.K.] feels that she belongs in a world containing blood relatives—blood relatives that will be with her forever. [G.R.K.]'s sense of being safe in the world is partially built on the strength of the nurturing interactions that she received from Father when she was being raised by Father until she was four years old.

***Id.*** at 11-12. We disagree.

Upon review, the record supports that, at the time of the subject proceedings, Father and G.R.K., then nine years old, did not share a necessary and beneficial relationship. ***See K.T.***, 296 A.3d at 1113. While it is undisputed that Father at one time shared a "strong bond" with G.R.K., this relationship

- 10 -

devolved over the course of the underlying dependency and had in fact been severed for over a year. *See* N.T., 4/3/24, at 30-31.

Specifically, Father's visitation with G.R.K. never progressed beyond supervised and became inconsistent in late 2022. *See id.* at 13, 26. Ms. Richards described the resulting annoyance and frustration to G.R.K., then approximately eight years old, leading to her desire to no longer attend visitation. *See id.* at 13. Ms. Richards testified:

> [COUNSEL FOR DHS]: Did [G.R.K.] express any concerns regarding the inconsistency of [F]ather's visits?
>
> MS. RICHARDS: Yes. She stopped wanting to go [and was] annoyed -- "He's not going to show up." So, then she started asking to not attend visits

*Id.* at 13 (brackets in original). Ms. Richards acknowledged, "[G.R.K.] used to cry about it a lot . . . . And, yeah, it made her feel bad."[6] *Id.* at 14. As discussed above, Father's supervised visits have been suspended since January 2023, and G.R.K. has had no contact with him since that time. *See id.* at 11-13, 29-20, 39-41. Ms. Richards testified:

> [COUNSEL FOR DHS]: Have there been any signs of harm from the lack of visits since January of -- of '23?
>
> MS. RICHARDS: No. She doesn't even ask about it anymore.

_____

[6] To the extent that Father argues that this testimony describes G.R.K.'s reaction to the suspension of Father's visitation, this misconstrues the context of Ms. Richards' testimony which is Father's inconsistent visitation. *See* Father's Brief at 9, 11.

- 11 -

*Id.* at 14.

Moreover, Ms. Richards testified that, although Father previously inquired of the foster mother regarding G.R.K.'s well-being, he has not done so for some time. Ms. Richards explained:

> [COUNSEL FOR DHS]: You said he hasn't had contact with you. Has he been involved at all in asking about how the [C]hildren are doing, how they're developing, how they're doing medically or educationally?
>
> MS. RICHARDS: I spoke with [the foster mother] about that. He used to call and check in on [G.R.K.] with [the foster mother] a few years ago. He has not done that in about the same amount of time. We lost contact since about last year.

*Id.* As a result, Ms. Richards opined that there would be no harm if G.R.K.'s bond with Father was severed. In fact, Ms. Richards stated, "It's been severed for a long time. She's fine without it." *Id.* at 25, 30-31.

Instead, as discerned by Ms. Richards, G.R.K. shared a primary parent-child bond with her pre-adoptive foster mother with whom she has been placed for over four years and who meets her daily needs. *See id.* at 8, 22-25. Specifically, Ms. Richards testified as follows:

> [COUNSEL FOR DHS]: Throughout that time, has her pre-adoptive caregiver been meeting all of [G.K.]'s general medical and educational needs?
>
> MS. RICHARDS: Yes.
>
> [COUNSEL FOR DHS]: Has she been providing her with love, safety, stability and support?
>
> MS. RICHARDS: Yes, she has.
>
> [COUNSEL FOR DHS]: Does she meet all of her emotional needs?

MS. RICHARDS: Yes

*Id.* at 22-23.

Thus, Ms. Richards testified unequivocally that it would be in G.R.K.'s best interests to terminate Father's parental rights. ***See id.*** at 25. Indeed, Ms. Richards continued, "[G.R.K.] deserves permanency. She asks about it all the time. Her words are, 'Am I adopted yet?'" ***Id.*** at 25. As Ms. Richards testified, G.R.K. wants to remain with and be adopted by her foster mother. ***See id.*** at 25-26; N.T., 5/2/24, at 17-18.

Based on the foregoing, we find no abuse of discretion or error of law in the trial court's holding that termination was warranted pursuant to Section 2511(b). Accordingly, we affirm the decrees terminating Father's parental rights.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>12/2/2024</u>